United States District Court
Southern District of Texas
**ENTERED**
February 11, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DR. MADHAVAN PISHARODI, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:19-cv-41 |
| | § | |
| WELLS FARGO BANK, N.A., | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

On February 5, 2019, Plaintiff Dr. Madhavan Pisharodi filed suit against Wells Fargo Bank N.A. in the 138th District Court in Cameron County, Texas. Dkt. No. 1-4. Pisharodi alleged breach of contract, civil conversion, negligence, and violations of the Deceptive Trade Practices Act in relation to items missing from the safety deposit box he rented from Wells Fargo. Id.

On March 18, 2019, Wells Fargo timely removed the case to this Court on the basis of diversity jurisdiction. Dkt. No. 1.

On December 17, 2021, Well Fargo filed a motion for summary judgment. Dkt. No. 20. The motion has been fully briefed. Dkt. Nos. 31, 32.

After reviewing the record and the relevant case law, it is recommended that the motion for summary judgment be granted. Pisharodi has failed to show a genuine dispute of material fact as to any of his claims.

## I. Background

### A. Factual Background

#### 1. Lease Agreement

On July 20, 2009, Pisharodi entered into an agreement with Wells Fargo to rent a full service safe deposit box at the branch at 835 East Levee Street in downtown Brownsville, Texas. Dkt. No. 20-1, pp. 7-8. The box was considered a "bank assisted" box. Dkt. No. 20-2, p. 12. The box was secured by two locks; Pisharodi was given two copies of a key that would open one lock and Wells Fargo retained a key to open the other

lock. Id.  A single key, irrespective of whether it was Pisharodi's or the bank's, could not open the safe deposit box. Dkt. No. 20-1, p. 20.

The lease agreement contained this paragraph:

By signing below you represent that you have examined the Box and agree that it is acceptable.  By signing below you acknowledge that you have received copies of this Agreement, the Safe Deposit Box Lease terms, the Wells Fargo Privacy (Consumer), the Wells Fargo Privacy Policy for Business Principals: Keeping Your Information Safe and Secure (Business), the Consumer or Business Fee and Information Schedule and two (2) keys to the Box which you agree to return when the lease terminates or you surrender the Box.  You also agree to the terms of the dispute resolution program described in the Safe Deposit Box Lease Terms disclosure.  Under this program our disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or before a judge.[1]

Dkt. No. 20-1, p. 8.

Pisharodi signed the lease agreement. Dkt. No. 20-1, p. 8.

The Safe Deposit Box Lease Terms ("lease terms"), which were directly referenced in the lease agreement, state that by leasing the Box, Pisharodi agreed to "the terms and conditions contained in" the lease terms; the lease agreement; the fee schedule; the bank's privacy policy; and "any additional disclosures that the Bank may provide to you." Dkt. No. 20-1, p. 12.

The lease terms provided:

Safe deposit boxes are secure locations where people may store things of value. However, it is not possible to guard against every possibility of physical loss, and the Bank does not provide insurance coverage for the contents of a safe deposit box. Furthermore, safe deposit boxes are not designed to withstand fire, explosion, intense heat, smoke, water (including fire suppression systems), building collapse or similar perils, and you assume the entire loss to the box contents from such risks. The Bank recommends that you arrange to have the contents of your safe deposit box insured by your personal insurance carrier.

---

[1] The Court notes that neither party has invoked this clause to compel arbitration.  "Because arbitration is contractual, and subject to principles of waiver, a district judge cannot order an arbitration that neither side wants." Briggs Stratton v. Local 232, Intern. Union, 36 F.3d 712, 715 (7th Cir. 1994).

Dkt. No. 20-1, p. 13.

The lease terms also expressly stated that the lease agreement and lease terms "create a lease and not a bailment." Dkt. No. 20-1, p. 16.  The lease terms also define the bank's "only obligation" as being "to allow authorized persons to and prevent unauthorized persons" from accessing the box. Id.

Furthermore, the lease terms state that "if you use the Box to store the following items, you assume the entire risk of loss or damage unless clear and convincing evidence is provided to the Bank showing the existence, quality and quantity of such item(s), and their deposit in the Box: Money; Valuable antiques, jewelry, works of art or craft and collectibles; and Securities or instruments payable to bearer." Id., p. 17.  In general, "[i]f a loss results from the negligent or willful misconduct of the Bank's directors, officers, employees or agents, the Bank's total liability will be limited to the minimum amount allowed by applicable statute or administrative rule in the state where the Box is located. In the absence of such a statute or rule, the Bank's total liability will be the lesser of your actual loss or $500.00." Id.  If the items lost were insured, then Wells Fargo's liability "will be reduced by the amount the insurance company pays." Id., p. 18.

The lease terms also state that Wells Fargo "has no way other than drilling the lock to open the box without your key." Dkt. No. 20-1, p. 20.

Finally, the lease terms expressly provide:

> if a legal proceeding is commenced, evidence that tends to prove that something was left in the Box on the last authorized entry, and was found missing on the next entry, will not create a presumption that it was lost because the Bank, its directors, officers, employees or agents, were negligent, intentionally did anything wrong or failed to exercise ordinary care. Nor will the Bank be required to prove that the loss was not its fault. You agree not to commence a legal action against the Bank, its directors, officers, employees or agents, more than one year after your cause of action accrues.

Dkt. No. 20-1, p. 18.

### 2. Loss of Items

According to the safe deposit box entrance record, the box was accessed on six dates: July 20, 2009; August 10, 2011; February 6, 2013; August 30, 2013; April 13, 2017;

and April 17, 2017. Dkt. No. 20-1.  The same signature appears for all six dates as the person accessing the box and it generally matches Pisharodi's signature. Id.; Dkt. No. 20-1, p. 8 (Pisharodi's signature on the lease agreement).  Pisharodi admitted, in response to a request for admissions, that he signed each of those signatures. Dkt. No. 20-2, p. 8.  At his deposition, Pisharodi stated that he was unable to "tell what I did and what did not do" on each visit to the safety deposit box. Dkt. No. 20-2, p. 23.  Pisharodi also testified that he always used the same keys to access the box. Dkt. No. 31-1, p. 32.

On February 6, 2013, Pisharodi bought a money order for $125, payable to Wells Fargo with the notation "Safe Box Drill Fee 1508." Dkt. No. 31-1, p. 111.  Pisharodi's safety deposit box was numbered "0158." Dkt. No. 20-1, p. 7.  Pisharodi stated that he has "no recollection" of the circumstances surrounding why this money order was purchased or why it had that notation. Dkt. No. 31-1, pp. 32, 36.

It is not apparent from the record why this money order was purchased or what the money was used for.  Corine Aguilar, a corporate representative for Wells Fargo, testified that Wells Fargo had no record of receiving the money because it's "beyond retention," indicating that Wells Fargo "doesn't have its own records from that year which would indicate whether or not it was or was not paid." Id., pp. 74, 77.  Aguilar also testified that there were no records showing that Pisharodi's box was drilled in 2013. Id., pp. 75-80.  She explained that if the lock was drilled, Pisharodi's keys would need to be replaced, so he would have been unable to open the lock at a later date with the same keys. Id.  Additionally, this money order was purchased four years prior to when Pisharodi discovered that items were missing from his box. Dkt. No. 20-1.

In June 2015, Wells Fargo moved its downtown Brownsville branch from East Levee Street to East Elizabeth Street. Dkt. No. 20-1, p. 30.  On June 13, 2015, the safety deposit boxes were moved, unopened, from the Levee Street location to the Elizabeth Street location. Id.  Customers were informed of this move and told that if they wanted to remove their items prior to the move, they could access the box prior to the close of business on June 12, 2015. Id.  Notice was mailed to Pisharodi, and his wife signed the certified mail receipt. Id., p. 40.

On April 13, 2017, Pisharodi opened the safety deposit box for the first time in over three years, only to discover that it was empty. Dkt. No. 20-2, p. 25. Pisharodi used the same keys to access the box in 2017 that he used in 2013. Dkt. No. 31-1, p. 32. Initially, he told a Wells Fargo employee that the box only contained documents. Id., pp. 25-26. He identified the documents as important documents from India, such as his high school graduation record, divorce paperwork and title to his home there. Dkt. No. 20-2, p. 23. He explained at his deposition that he had closed his banking account at Wells Fargo and opened a new account at Compass/BBVA and mistakenly thought that he had also opened a safety box at Compass and had moved his valuables to that non-existent box. Id.

In his response to interrogatories, Pisharodi alleges that "279 Krugerrand 1-ounce gold coins, 100 Panda 1-ounce gold coins, 25 Mexican 1.5-ounce gold coins, 10 Maple Leaf 1-ounce gold coins, one (1) United States Constitution Commemorative 12-ounce gold coin, one (1) Panda 12-ounce gold coin, three (3) gold bars weighing five ounces apiece, and multiple items of jewelry including diamonds and including gold rings, bangles, necklaces, and earrings" were removed from the box. Dkt. No. 20-2, p. 10. In his deposition, Pisharodi testified that all of those items were in the safety deposit box in 2013. Dkt. No. 31-1, p. 15.

On February 22, 2018, members of the Brownsville Police Department, pursuant to a search warrant, examined the safety deposit box. Dkt. No. 20-2, pp. 33-35. The police investigators lifted eleven latent fingerprints from the box. Id. Those eleven fingerprints were "found to be of insufficient quality" to enable a fingerprint search. Id.

**B. Procedural History**

On February 5, 2019, Pisharodi filed suit against Wells Fargo in the 138th District Court in Cameron County, Texas. Dkt. No. 1-4. Pisharodi alleged breach of contract, civil conversion, negligence, and violations of the Deceptive Trade Practices Act. Id.

On March 18, 2019, Wells Fargo timely[2] removed the case to this Court on the basis of diversity jurisdiction. Dkt. No. 1.  Pisharodi is a citizen of Texas and Wells Fargo is a citizen of South Dakota. Id.

On December 17, 2021, Well Fargo filed a motion for summary judgment. Dkt. No. 20.  It argued that the lease terms control, defeating any claim for breach of contract. Id. Wells Fargo further argues that the conversion, negligence and DTPA claims are time-barred and also barred by the economic loss rule. Id.

On January 31, 2022, Pisharodi timely filed his response. Dkt. No. 31.  He argues that the lease terms do not control because they were not part of the safe deposit box lease agreement. Id.  He further argues that Wells Fargo violated the lease agreement, and that its actions constituted conversion, negligence, and violations of the DTPA. Id.  Pisharodi also argues that the statute of limitations has not run. Id.

On February 7, 2022, Wells Fargo filed its response brief. Dkt. No. 32.  It argued that the lease terms were incorporated into the lease agreement. Id.  It also re-urged its prior claims regarding conversion, negligence, and violations of the DTPA. Id.

## II. Applicable Law

### A. Diversity Jurisdiction

As relevant here, federal courts have jurisdiction over civil actions where (1) "the matter in controversy exceeds the sum or value of $75,000;" and, (2) the action is between citizens of different States. 28 U.S.C. § 1332(a)(1).  In his complaint, Pisharodi seeks damages in excess of $200,000. Dkt. No. 1-4.  Furthermore, Pisharodi is a citizen of Texas and Wells Fargo is a citizen of South Dakota. Dkt. No. 1. No party disputes these facts. Diversity jurisdiction is clear in this case.

Because federal jurisdiction is based on diversity of citizenship, the court applies "Texas substantive law." R&L Inv. Prop., L.L.C. v. Hamm, 715 F.3d 145, 148-49 (5th Cir.

---

[2] There is no indication in the record that Wells Fargo was ever served with the state court action, which means that the 30-day removal deadline was never triggered. 28 U.S.C. § 1446(b). The Fifth Circuit has affirmed the right of state court defendants to remove a case prior to being served. Delgado v. Shell Oil Co., 231 F.3d 165, 177 (5th Cir. 2000).

2013).  "If no state court decisions control, [a federal court] must make an 'Erie[3] guess' as to how the Texas Supreme Court would apply state law." Beavers v. Metro. Life Ins. Co., 566 F.3d 436, 439 (5th Cir. 2009) (footnote added).

### B. Summary Judgment

Summary judgment is appropriate when the moving party has established that the pleadings, depositions, answers to interrogatories, admissions, and affidavits – if any – demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).  A genuine issue is "real and substantial, as opposed to merely formal, pretended, or a sham." Bazan v. Hidalgo Cnty., 246 F.3d 481, 489 (5th Cir. 2001).  A material fact is one that might influence the outcome of the suit. Id.  Accordingly, a "genuine issue of material fact exists where evidence is such that a reasonable jury could return a verdict for the non-movant." Piazza's Seafood World, L.L.C. v. Odom, 448 F.3d 744, 752 (5th Cir. 2006).

If "the nonmoving party will bear the burden of proof at trial on a dispositive issue," then "a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

"If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim." Norwegian Bulk Transport A/S v. International Marine Terminals Partnership, 520 F.3d 409, 412 (5th Cir. 2008). The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. Id.

Additionally, the Court must review all evidence in the light most favorable to the non-moving party. Piazza's Seafood World, 448 F.3d at 752. Factual controversies must be resolved in favor of the non-moving party, "but only when there is an actual controversy,

---

[3] Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938).

that is, when both parties have submitted evidence of contradictory facts." <u>Murungi v. Xavier Univ. of La.</u>, 313 Fed. App'x. 686, 688 (5th Cir. 2008) (unpubl.) (citing <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994)).  Thus, "in the absence of proof," the court cannot "assume that the nonmoving party could or would prove the necessary facts." <u>Little</u>, 37 F. 3d at 1075.

Finally, "a court should not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment." <u>Chacon v. Copeland</u>, 577 Fed. App'x. 355, 360 (5th Cir. 2014) (unpubl.) (quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000)) (internal quotations omitted).

## III. Analysis

The Court notes that Pisharodi has made a breach of contract claim, three tort-based claims (conversion, negligence, violations of the Deceptive Trade Practices Act) and one statutory claim based on TEX. FIN. CODE § 59.107.  The Court will first address the contract claim, including whether the lease terms are part of the overall contract.  It will then analyze the issues relating to the tort claims before turning to the statutory claims.

### A. Breach of Contract

#### 1. Terms of Contract

To determine whether Wells Fargo breached the contract, the Court must ascertain whether the lease terms are part of the contract.  The Court concludes that the lease terms are part of the overall lease agreement contract.

Pisharodi only signed the lease agreement, but did not sign the lease terms. <u>See</u> Dkt. No. 20-1, p. 8 (lease agreement), p. 12 (lease terms).  While the lease terms are not directly set out in the lease agreement, they are mentioned by name. <u>Id.</u>, p. 8 ("By signing below you acknowledge that you have received copies of . . . the Safe Deposit Box Lease terms").  Furthermore, the lease agreement states that Pisharodi agreed "to the terms of the dispute resolution program described in the Safe Deposit Box Lease Terms disclosure." <u>Id</u>.  Thus, the Court must consider whether the language contained in the lease agreement was sufficient to incorporate the lease terms by reference.

Under Texas law, "instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other, and that a court may determine, as a matter of law, that multiple documents comprise a written contract. In appropriate instances, courts may construe all the documents as if they were part of a single, unified instrument." Fort Worth Indep. Sch. Dist. v. City of Fort Worth, 22 S.W.3d 831, 840 (Tex. 2000) (internal citations & footnotes omitted). "An integration clause is not required in order to incorporate one document into another." Gray & Co. Realtors v. Atl. Hous. Found., Inc., 228 S.W.3d 431, 436 (Tex. App. 2007). As long as the "incorporated document" is "referenced by name" in the contract, then it is considered to be part of the contract. Id.

The lease agreement explicitly references the lease terms by name. Dkt. No. 20-1, p. 8. Indeed, the lease agreement includes language indicating that the parties were agreeing to be bound by the lease terms. Dkt. No. 20-1, p. 8 ("You also agree to the terms of the dispute resolution program described in the Safe Deposit Box Lease Terms disclosure"). The lease terms have no purpose if they are not considered part of the overall contract.

Texas courts – and federal courts applying Texas law – have repeatedly found that, as long as the signed contract explicitly references another document, then that document becomes part of the overall contract. Gray & Co. Realtors, 228 S.W.3d at 436; Benge Gen. Contracting, LLC v. Hertz Elec., LLC, 2021 WL 5317840, at *10 (Tex. App. Nov. 16, 2021); Al Rushaid v. Nat'l Oilwell Varco, Inc., 757 F.3d 416, 421 (5th Cir. 2014); Wells Fargo Bank, N.A., v. Farkas, 2017 WL 1611548, at *3 (W.D. Tex. Apr. 28, 2017); Veldekens v. GE HFS Holdings, Inc., 2009 WL 10693904, at *14 n. 5 (S.D. Tex. Aug. 3, 2009) ("the specific naming of a document is sufficient for incorporation by reference"); JMT Pioneer LLC v. Earnhart, 2021 WL 1884652, at *2 (Tex. App. May 11, 2021), reh'g denied (June 11, 2021) ("Documents referenced in or attached to a contract become part of the contract so long as the signed document clearly reflects that intent"). The lease terms

are referenced in such a way in the lease agreement as to incorporate the lease terms into the overall agreement.

By signing the lease agreement, Pisharodi "acknowledge[d]" that he had received copies of the lease agreement and the lease terms. Dkt. No. 20-1, p. 8.  Thus, he would have received the lease terms and had an opportunity to review them and would have understood them to be part of a unified contract. See Sierra Frac Sand, L.L.C. v. CDE Glob. Ltd., 960 F.3d 200, 204 (5th Cir. 2020) ("A party who signs an agreement is presumed to know its contents. That includes documents specifically incorporated by reference."). Accordingly, the Court concludes that the lease terms are part of the overall lease agreement.

Pisharodi's arguments to the contrary are unavailing.  Pisharodi argues that Texas law shows that the mere reference to the lease terms is insufficient to make them part of the overall contract, citing Bob Montgomery Chevrolet, Inc. v. Dent Zone Companies, 409 S.W.3d 181, 190 (Tex. App. 2013).  In that case, a car dealership entered into an agreement with a dent repair company to become a certified repair center for paintless autobody dent repair. Id., at 185.  The signed agreement stated that "[a]dditional benefits, qualifications and details" about the repair program could be found at a certain internet site. Id.  That internet site contained a forum selection clause, which the dent repair company sought to enforce. Id.  The Texas appellate court found that the reference to the website "indicates that the internet document contained informative material only, not binding terms and conditions intended to be part of the parties' contract." Id. at 190.  It held that the internet document was not part of the broader agreement.  The facts of this case and the one Pisharodi cited are far different.  Indeed, in this case, the reference to the lease terms in the agreement expressly indicated that the parties intended to be bound by them. Dkt. No. 20-1, p. 8.  As such, they were not just an informative handout.

Pisharodi argues that there is a question of fact as to whether he actually received those terms or understood them. Dkt. No. 31, p. 14.  Despite such an assertion, no such factual question exists.

"Absent fraud, misrepresentation, or deceit, parties are bound by the terms of the contract they sign, regardless of whether they read it or thought it had different terms." Honrubia Properties, Ltd. v. Gilliland, 2007 WL 2949567, at *8 (Tex. App. Oct. 11, 2007). Pisharodi has not alleged that Wells Fargo engaged in fraud, misrepresentation, or deception when he signed the lease agreement. He acknowledged, as a matter of contract, that he received the lease terms prior to signing the lease agreement. Dkt. No. 20-1, p. 8. He cannot attempt to create a fact issue by arguing that there is no evidence that he received them; his signature on the contract establishes otherwise.

### 2. Breach of Contract

After establishing the terms of the contract, the Court turns to the question of whether the contract was breached. The elements of a breach of contract claim are "(1) the existence of a valid contract between plaintiff and defendant, (2) the plaintiff's performance or tender of performance, (3) the defendant's breach of the contract, and (4) the plaintiff's damage as a result of the breach." Prime Products, Inc. v. S.S.I. Plastics, Inc., 97 S.W.3d 631, 636 (Tex. App. 2002). In this case, there is no question that the lease agreement and the lease terms constitute a valid contract, meeting the first element. Furthermore, Pisharodi tendered performance, in that he always paid the rent in full on the safety deposit box. Additionally, there seems to be no question, given Pisharodi's allegations, that he suffered a loss. Thus, it is the third element, and any limitations on that loss, that are the crucial issues in this case.

The question of "what conduct is required by the parties—i.e., what duties exist under a contract" is a question of law for the Court to determine, based on the language of the contract. Vast Constr., LLC v. CTC Contractors, LLC, 526 S.W.3d 709, 718 (Tex. App. 2017). The plain language of the lease terms states that "The Bank's only obligation under the Lease Agreement and these Lease Terms shall be to allow authorized persons to and prevent unauthorized persons from entering, the Box in accordance with the Lease Agreement." Dkt. No. 20-1, p. 16. Thus, so long as Wells Fargo did not allow unauthorized persons to access the safety deposit box, it met its contractual duty and did not breach the contract.

The safety deposit box log showed that the box was accessed on six dates and Pisharodi was the person who accessed it on each date. Dkt. No. 20-1, p. 28; Dkt. No. 20-2, p. 8.  Pisharodi also testified that he always used the same keys to access the box. Dkt. No. 31-1, p. 32.  Aguilar stated that if a safety deposit box lock is drilled out, a new set of keys must be issued and the prior keys will be inoperative. Dkt. No. 20-1, pp. 4-5 ("A customer's key to the old lock cannot open a newly installed lock.").  The police were unable to find any useable fingerprints on the box showing who had handled it. Dkt. No. 20-2, pp. 33-35.  Thus, there is no genuine issue of material fact showing that an unauthorized person accessed the box.

Pisharodi places great importance on the money order that contained the notation "drill fee" to show that the lock was drilled. Dkt. No. 31, p. 15.  That money order does not show that any unauthorized person accessed the box or that the box was not secured.  That money order was issued on February 6, 2013. Dkt. No. 31-1, p. 111.  Pisharodi visited the box on that date. Dkt. No. 20-1, p. 28.  Furthermore, Pisharodi visited the box again on August 30, 2013. Id.  Pisharodi's own testimony indicates that all of his valuables were in the safety deposit box in 2013. Dkt. No. 31-1, p. 15.  Thus, even if the lock was drilled in February 2013, none of the valuables were taken as part of that drilling because (1) he was able to access the box six months later with nothing missing and (2) his keys still worked six months later, indicating that the locks were not changed without his knowledge.

Pisharodi speculates that the box was drilled when the safety deposit boxes were moved to the new branch location.  He argues that Wells Fargo's evidence as to which boxes were drilled during the move "contain numerous inaccuracies and gaps in the record." Dkt. No. 31, p. 15.  Again, he testified that he used the same key to access the box in 2017 that he used in 2013. Dkt. No. 31-1, p. 32.  The uncontroverted evidence shows that if Wells Fargo drills out a lock, it must issue new keys to the box holder, because the prior keys will no longer work. Dkt. No. 20-1, pp. 4-5.

Pisharodi's speculation is not a substitute for evidence and will not preclude the granting of summary judgment.  "Conclusional allegations, speculation, improbable inferences, or a mere scintilla of evidence" are insufficient to defeat a summary judgment

motion. Dunn v. Prince, 327 F. App'x 452, 453 (5th Cir. 2009) (citing Michaels v. Avitech, Inc., 202 F.3d 746, 754-55 (5th Cir. 2000)).  Furthermore, Pisharodi agreed, in the lease terms, that "evidence that tends to prove that something was left in the Box on the last authorized entry, and was found missing on the next entry, will not create a presumption that it was lost because the Bank, its directors, officers, employees or agents, were negligent, intentionally did anything wrong or failed to exercise ordinary care." Dkt. No. 20-1, p. 18.  Thus, Pisharodi cannot simply rest on an argument that "it was there, now it is gone, so it's the Bank's fault."

Simply put, there is no genuine issue of material fact as to whether any unauthorized person accessed the box.

### 3. Damages

Even if the Court were to find that Wells Fargo breached the contract, Pisharodi would not be entitled to damages.

The lease terms clearly state that Wells Fargo's liability is limited to the lesser of the actual value of the items lost or $500. Dkt. No. 20-1, p. 17.  Pisharodi claims damages of "between $897,412.60 and $2,692,237.80," depending on the value of gold on different dates. Dkt. No. 31, p. 23.  Thus, Wells Fargo's liability would be first be limited to $500. However, that $500 is offset by any insurance payouts. Dkt. No. 20-1, p. 18.  Pisharodi received $5,200 from his homeowner's insurance policy. Dkt. No. 20-2, p. 27. Accordingly, Wells Fargo owes Pisharodi no damages under the terms of the agreement.

Pisharodi argues that this clause should be held void because Texas courts void such clauses "where one party is at such disadvantage in bargaining power that he is practically compelled to submit to the stipulation." Dkt. No. 31, p. 17 (quoting Crowell v. Hous. Auth. Of City of Dallas, 495 S.W.2d 887, 889 (Tex. 1973)).  However, "[i]n the absence of a controlling public policy to the contrary, contracting parties can limit their liability in damages to a specified amount." Head v. U.S. Inspect DFW, Inc., 159 S.W.3d 731, 748 (Tex. App. 2005).  The Court must consider the relationship between the parties and their relative bargaining power in determining whether a contractual limitation on liability is contrary to public policy. Id.

The Court notes that, when considering the disparity in bargaining power, the Court looks to whether the plaintiff had alternatives, other than to contract with the defendant.  In cases where the limitation of damages provision is voided, the plaintiff had almost no bargaining power.  In Crowell, the plaintiffs were people in low-income housing, who had to sign a lease agreement waiving any and all tort claims against the landlord; they obviously lacked the economic power to easily change landlords.  Crowell, 495 S.W.2d at 889 (noting that the defendants "lease accommodations only to families or persons who lack sufficient income to enable them, without financial assistance, to live in decent, safe and sanitary dwellings without overcrowding").   In Crowell, the Texas Supreme Court noted that in some cases, "the indispensable need for [the defendant's] services deprives the customer of any real bargaining power." Crowell, 495 S.W.2d at 889.

In instances where the plaintiff has the economic power and ability to choose other providers, the Courts will not hold a limitation of liability clause to be void against public policy. Head, 159 S.W.3d at 748 (If the plaintiff was "unsatisfied with the limitation of liability provision," she was free to choose another home inspection service).

In this case, Pisharodi is a medical doctor who was renting a safe deposit box, a service offered by many banks. See, e.g., First Nat. Bank of Andrews v. F.D.I.C., 707 F. Supp. 265, 269 (W.D. Tex. 1989) ("Safety deposit boxes are similar to trust departments in that most banks are expected to offer these services to persons who borrow and safeguard their funds at the bank.").  If Pisharodi found the limitation of liability provision to be unacceptable, he was free to rent a box from a provider who offered more favorable terms.  It is self-evident that a medical doctor seeking a safe place to store approximately one million dollars in gold is in a much different place, and far superior economic bargaining position, than people who live in low-income housing.  The limitation of liability provision is not void and contrary to public policy.  Accordingly, even if Wells Fargo breached the contract, Pisharodi would not be entitled to any damages.

### B. Tort Claims

Pisharodi has pled three tort claims against Wells Fargo: conversion, negligence, and violations of the DTPA.  Summary judgment is appropriate because (1) the tort claims

are barred by the economic loss doctrine; (2) the lease terms create a one-year statute of limitations for pursuing such claims; and (3) Pisharodi has not shown a genuine dispute of material fact as to every element of his claims.

### 1. Economic Loss Rule

"The economic loss rule generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." Chapman Custom Homes, Inc. v. Dall. Plumbing Co., 445 S.W.3d 716, 718 (Tex. 2014) (per curiam).  "If the matter in dispute is the subject of a contract, a party may elect a recovery in tort if the duty breached stands independent from the contractual undertaking and the alleged damages are not solely the result of a bargained-for contractual benefit." Brandon v. Wells Fargo Bank, N.A. as Tr. for Registered Holders of LaSalle Com. Mortg. Sec., Inc. 2007-MF5, Com. Mortg. Series 2007-MF5, 2020 WL 2776714, at *12 (Tex. App. May 28, 2020).

If the injury alleged arose out of a contractual duty, then the plaintiff cannot seek tort relief, even if the defendant negligently acted in failing to fulfill its duty. Dixie Carpet Installations, Inc. v. Residences at Riverdale, LP, 599 S.W.3d 618, 636 (Tex. App. 2020). Put another way, the economic loss rule applies when a "conversion claim rests on the fact" that the defendant's negligent conduct prevented the plaintiff "from receiving its bargained for consideration." Id.  The economic loss rule also applies to DTPA claims, where the injury resulted from the failure to perform under the contract. BCC Merchant Solutions, Inc. v. Jet Pay, LLC, 129 F. Supp. 3d 440, 469 (N.D. Tex. 2015).

Pisharodi alleges that Wells Fargo failed to secure his belongings from unauthorized persons.  Wells Fargo's duty to protect his belongings arose solely due to the contract.  Even if Wells Fargo was negligent in carrying out its contractual duties, the economic loss rule mandates that Pisharodi's claims arise only under contract law, and he cannot seek any tort recoveries.

Pisharodi alleges that the economic loss rule does not apply because his relationship with Wells Fargo was that of a bailor-bailee.  "A bailment relationship does not create a specific cause of action but instead allows the bailor to choose specific relief

for breach of the bailment contract, e.g., an action for breach of contract, or an action for conversion." W.E. Stephens Mfg. Co. v. Goldberg, 225 S.W.3d 77, 81 (Tex. App. 2005).

The distinction between bailor-bailee and lessor-lessee is vitally important in this case. "Under Texas law, a bailment is a delivery of goods to another which creates a duty of trust on the part of the bailee to return the deposited goods as directed." Marine Indem. Ins. Co. of Am. v. Lockwood Warehouse & Storage, 115 F.3d 282, 286 (5th Cir. 1997). In contrast, a lessor "has the duty of ordinary care in maintaining the premises it controls, but does not have a duty to exercise care regarding the lessee's property." Id. Pisharodi's relationship with Wells Fargo was not that of bailor-bailee, but rather that of lessor-lessee.

First, the lease agreement refers to Pisharodi as the "lessee." Dkt. No. 20-1, p. 8. The lease terms state that, "Unless otherwise required by applicable law, the Bank's relationship with you concerning your Box is that of lessor and lessee, and no fiduciary, quasi-fiduciary, or special relationship exists between you and the Bank." Id., p. 12.

Furthermore, Texas law expressly states that, "[i[n a safe deposit transaction the relationship of the safe deposit company and the renter is that of lessor and lessee and landlord and tenant, and the rights and liabilities of the safe deposit company are governed accordingly in the absence of a contract or statute to the contrary. The lessee is considered for all purposes to be in possession of the box and its contents." TEX. FIN. CODE § 59.103. Thus, both under the contract and the relevant statute, Pisharodi did not have a bailer-bailee relationship with Wells Fargo.

Pisharodi attempts to circumvent this finding by arguing that once Wells Fargo opened the safe deposit box, it transformed a lessor-lessee relationship into a bailor-bailee relationship. The only case to hold as such did so under far different factual circumstances. Mitchell v. Bank of Am. Nat. Ass'n, 2002 WL 31139375, at *7 (Tex. App. Sept. 27, 2002) In Mitchell, the renters of a safe deposit box failed to pay the required rent and the bank invoked its contractual right to remove the contents of the box for non-payment. Id. The bank opened the box, and removed the contents, which the plaintiffs alleged led to the loss of the property. Id. The Texas appellate court held that once the bank "exercised its right

to take control of the property," it transformed the relationship between the bank and the plaintiffs into a bailor-bailee relationship. Id.

If there was any evidence in this case showing that Wells Fargo opened the box and removed the property inside, then the holding in Mitchell would be dispositive. As has been recounted, Pisharodi has no evidence that any unauthorized person – whether it be a bank employee or an outsider – entered his safe deposit box. Furthermore, the uncontroverted evidence shows that if his lock was drilled out, he would have needed a new key to access the lock in 2017. Dkt. No. 20-1, pp. 4-5. Yet, Pisharodi testified he always used the same keys to access the box. Dkt. No. 31-1, p. 32. Because there is no evidence showing that the bank opened the box outside of his presence, then the relationship between Pisharodi and Wells Fargo remained that of a lessor-lessee. Accordingly, the economic loss rule applies to all of Pisharodi's tort claims for conversion, negligence, and violations of the DTPA.

### 2. Statute of Limitations

Pisharodi's tort claims are also barred by a contractual statute of limitations.

The lease terms state that, "[y]ou agree not to commence a legal action against the Bank, its directors, officers, employees or agents, more than one year after your cause of action accrues." Dkt. No. 20-1, p. 18. Texas courts have recognized that parties can enter into agreements that create a shorter statute of limitations than the law otherwise provides. Vincent v. Comerica Bank, 2006 WL 1295494, at *5 (S.D. Tex. May 10, 2006) (collecting cases). The only exception under Texas law is breach of contract claims; the parties must have a minimum two-year statute of limitations for any breach of contract claim. TEX. CIV. PRAC. & REM. CODE § 16.070(a). However, that two-year mandatory period does not apply to extracontractual claims, such as tort claims. Arnold & Co., LLC v. David K. Young Consulting, LLC, 2015 WL 268520, at *4 (W.D. Tex. Jan. 21, 2015) (collecting cases).

Under the lease terms, Pisharodi had one year to commence a legal action against Wells Fargo for the tort claims once the cause of action accrued. Dkt. No. 20-1, p. 18. "A cause of action accrues when facts come into existence that permit a plaintiff to recover."

Caver v. Clayton, 618 S.W.3d 895, 899 (Tex. App. 2021).  Pisharodi knew on April 13, 2017, that his valuables were missing. Dkt. No. 20-1.  Thus, he had until April 2018 to file any tort-based claims.  He did not file suit until February 2019. Dkt. No. 1.  Accordingly, these claims are untimely filed.

However, even if the claims are not barred by the economic loss rule and are considered timely filed, summary judgment is still appropriate.

### 3. Conversion

Wells Fargo is also entitled to summary judgment as to the claim that it committed conversion.

The elements of a conversion claim are that (1) the plaintiff "legally possessed the property or was entitled to it; (2) the defendant wrongfully exercised dominion and control over the property, excluding the plaintiff; (3) the plaintiff demanded the property's return; and (4) the defendant refused." Arthur W. Tifford, PA v. Tandem Energy Corp., 562 F.3d 699, 705 (5th Cir. 2009).

Simply put, there is no evidence that Wells Fargo exercised wrongful dominion and control over the property.  Pisharodi has the burden of proving that Wells Fargo wrongfully exercised dominion and control. Bandy v. First State Bank, Overton, Tex., 835 S.W.2d 609, 622 (Tex. 1992) (emphasis added).  Assuming that the gold was taken from the safety deposit box, there is no evidence that Wells Fargo or its employees exercised any type of wrongful dominion and control over the property.

Pisharodi speculates that Wells Fargo drilled the box opened and removed its contents. Dkt. No. 31, p. 19.  Again, the evidence shows that if the lock was drilled out, Pisharodi would have needed a new key to access his box and he admitted that he always used the same keys. Dkt. No. 20-1, pp. 4-5; Dkt. No. 31-1, p. 32.  In the complaint, he also speculates that an employee of the moving company may have stolen the goods, without any showing of how this moving company employee would have been able to access the contents of the box. Dkt. No. 1-4, p. 10, n. 1.  Speculation is not an acceptable substitute for evidence. Dunn, 327 Fed. App'x at 453.  Summary judgment is appropriate.

### 4. Negligence

"The elements of a claim for negligence include a duty, a breach of the duty, causation and damages." R&M Mixed Beverage Consultants, Inc. v. Safe Harbor Benefits, Inc., 578 S.W.3d 218, 232 (Tex. App. 2019).  There is no legal duty in this case.  As was previously discussed, Pisharodi had a lessor-lessee relationship with Wells Fargo.  Thus, Wells Fargo was under no legal duty to protect Pisharodi's belongings inside of the safety deposit box. Marine Indem. Ins. Co. of Am., 115 F.3d at 286.  "If no legal duty exists, neither does a cause of action for negligence." Jones v. Pesak Bros. Constr., Inc., 416 S.W.3d 618, 630 (Tex. App. 2013).  Summary judgment is appropriate as to this claim.

### 5. DTPA

Pisharodi alleges that Wells Fargo violated the DTPA when it breached an implied or express warranty and when it engaged in unconscionable conduct. Dkt. No. 1-4, pp. 10-11.  Wells Fargo is entitled to summary judgment as to these claims.

As to the breach of an implied or express warranty, Pisharodi alleged that Wells Fargo "warranted to Plaintiff that Plaintiff's valuables would be safe under Defendant's care." Dkt. No. 31, p. 23.  The record shows that Wells Fargo made no such warranty.  Indeed, the record indicates just the opposite.

The lease terms state that Wells Fargo "makes no warranties of any kind, express or implied, including any implied warranty of merchantability or fitness for a particular purpose." Dkt. No. 20-1, p. 18.  The lease terms also stated that "it is not possible to guard against every possibility of physical loss" and Wells Fargo recommended that lessees "arrange to have the contents of your safe deposit box insured by your personal insurance carrier." Id., p. 13.  Simply put, Wells Fargo made no implied or express warranty that Pisharodi's valuables would be safe.

As to the unconscionable conduct claim, the DTPA "creates a cause of action where an unconscionable action or course of action is a producing cause of actual damages" The Cadle Co. v. Munawar, 2005 WL 1300783, at *4 (Tex. App. June 2, 2005). Unconscionable conduct is defined, by statute, as: "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or

capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE § 17.45(5). This "requires a showing that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated," when considering the entire transaction, not just the injury. Chastain v. Koonce, 700 S.W.2d 579, 584 (Tex. 1985).

There is no evidence that Wells Fargo took advantage of Pisharodi's lack of knowledge, ability, experience, or capacity at all, much less to a "grossly unfair degree." He was given the lease terms prior to signing the agreement and those terms set out the Bank's duties and warned him that loss was always a possibility. These are the same lease terms that presumably every person renting a box would have agreed to; unless those terms are unconscionable toward every person, they would not have been unconscionable toward Pisharodi. There is no evidence that Pisharodi was subjected to flagrant and unmitigated unfairness in the transaction. Therefore, summary judgment is appropriate as to this claim.

### C. Texas Finance Code Claim

Pisharodi alleges that the Defendants breached the requirements of the Texas Finance Code relating to relocating safety deposit boxes. Summary judgment is appropriate as to this claim.

As an initial matter, this claim was not raised in the complaint. It was first raised as part of the summary judgment briefing. Dkt. No. 31, p. 16. Because it was not raised in the complaint, it is not properly before the Court. See Cutrera v. Bd. of Supervisors of La. State Univ., 429 F.3d 108, 113 (5th Cir. 2005) ("A claim which is not raised in the complaint, but, rather, is raised only in response to a motion for summary judgment is not properly before the court.").

Even if it is properly before the Court, the relevant statute does not create a private right of action. The statute sets forth the requirements for a non-emergency opening and relocation of a safety deposit box. TEX. FIN. CODE § 59.107. Under Texas law, "a statute creates a private cause of action only when a legislative intent to do so appears in the statute as written." Tobias v. SLP Brownwood LLC, 2021 WL 2584505, at *2 (Tex. App. June 24, 2021) (quoting Brown v. De La Cruz, 156 S.W.3d 560, 567 (Tex. 2004)) (internal quotation marks omitted). There is no indication in §§ 59.101-59.110 –which

addresses the legal requirements for safety deposit boxes generally – was written to create a private right of action. There is no language indicating that customers can sue for damages for violations of this statute. See Brown, 156 S.W.3d at 564 (noting that a statutory reference to "damages" typically refers to private civil causes of action, but a reference to "civil penalty" typically refers to civil cases brought by public prosecutors).

Furthermore, even if there is a private right of action, Pisharodi has not shown that there is a genuine issue of material fact as to whether Wells Fargo violated this statute. The law provides that "[a]safe deposit company may not relocate a safe deposit box rented for a term of at least six months if the box rental is not delinquent or open a safe deposit box to relocate its contents to another safe deposit box or other location except: (1) in the presence of the lessee; (2) with the lessee's written authorization; or (3) as otherwise provided by this section or Section 59.108." TEX. FIN. CODE § 59.107(a).

The statute further provides that "[n]ot later than the 30th day before the scheduled date of a nonemergency relocation, the safe deposit company shall give notice of the relocation to each lessee of the safe deposit box. The notice must state the scheduled date and time of the relocation and whether the box will be opened during the relocation." § 59.107(c). If such notice is timely given, "[a] lessee may personally supervise the relocation or authorize the relocation." § 59.107(d) (emphasis added). The natural reading of this statute is that a safety deposit box company can comply with 59.107(a)(3) – "as otherwise provided by this section" – by sending notice of the move at least 30 days in advance and giving the lessee the right to supervise or authorize the relocation.

On May 14, 2015, Wells Fargo mailed the relocation notice to Pisharodi, notifying him that the box would be moved on June 13, 2015. Dkt. No. 20-1, p. 3. This notice was sent exactly 30 days in advance of the move. Pisharodi had the statutory right to personally supervise or authorize the move of his safety deposit box, but Wells Fargo was also permitted to move the box in the absence of his supervision or authorization. § 59.107(d). Wells Fargo complied with its obligations under the statute. Accordingly, summary judgment is appropriate as to this claim.

## IV. Recommendation

It is recommended that the motion for summary judgment filed by Wells Fargo be granted. Dkt. No. 20.  The Court should issue a judgment that Plaintiff Madhavan Pisharodi take nothing.

The parties have fourteen (14) days from the date of being served with a copy of this Report and Recommendation in which to file written objections, if any, with the United States District Judge. 28 U.S.C. § 636(b)(1). A party filing objections must specifically identify the factual or legal findings to which objections are being made. The District Judge is not required to consider frivolous, conclusive, or general objections. Battle v. United States Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987).

If any party fails to timely object to any factual or legal findings in this Report and Recommendation, the District Judge is not required to conduct a de novo review of the record before adopting these findings. If the District Judge chooses to adopt such findings without conducting a de novo review of the record, the parties may not attack those findings on appeal, except on the grounds of plain error. Alexander v. Verizon Wireless Servs., L.L.C., 875 F.3d 243, 248 (5th Cir. 2017).

DONE at Brownsville, Texas on February 11, 2022.

Ronald G. Morgan
United States Magistrate Judge